No.,2372.

THE PEOPLE OF THE STATE OF CALIFORNIA, *ex. rel.* M. M. KIM-
BERLY, APPELLANT, *v.* PABLO DE LA GUERRA, RESPONDENT.

TREATY OF GUADALUPE HIDALGO.—INHABITANTS OF CEDED TERRITORY.—CITI-
ZENSHIP.—The treaty of Guadalupe Hidalgo had the effect directly and
of itself to fix the status of the inhabitants of the ceded territories, in
their relation as citizens to the respective Governments of Mexico
and the United States.

IDEM.—ARTICLE IX.—The only way in which it was possible for Congress
to admit the Mexicans in the territory ceded by the treaty of Guadalupe
Hidalgo to the enjoyment of all the rights of citizens of the United
States, was by incorporating the ceded territory into the Union as
States.

IDEM.—ADMISSION OF A STATE.—After admission into the Union, no Act of
Congress was necessary to define the rights of the inhabitants who were
recognized as members of the community organized into a State.

CITIZENSHIP.—The possession of all practical rights is not essential to citi-
zenship.

CALIFORNIA.—ADMISSION OF, AS A STATE.—QUALIFICATION OF ELECTORS.
When Congress admitted California as a State, the constitutent mem-
bers of the State, in their aggregate capacity, became vested with the
sovereign powers of government " according to the principles of the
Constitution," and had the right to prescribe the qualifications of
electors.

IDEM.—TREATY OF GUADALUPE HIDALGO.—It was no violation of the ninth
article of the Treaty of Guadalupe Hidalgo that the qualifications of
electors, as prescribed in the Constitution of California, were such as to
exclude some of the inhabitants from certain political rights.

APPEAL from the County Court of Santa Barbara County.

Judgment was for defendant; and plaintiff appealed.

The other facts are stated in the opinion.

*A. Packard,* for Appellant.
*Eugene Lies,* of Counsel.

If the judicial election had taken place under the Act of
1851, (p. 287) or that of 1853, (p. 333), neither of which
prescribes any qualifications, the relator might need to
rely entirely upon the principle discussed in the case of
*Walther* v. *Rabolt* (30 Cal. 185). But, at the time of this
election, the Act of April 20, 1863, was in force; and its 19th
Section declares that "no person shall be eligible to the

office of District Judge who shall not have been a citizen of the United States and a resident of this State for two years and of the District one year, next preceding his election."

The error assigned by appellant is that the Court below decided in substance that respondent was, and had been for two years before his election, a citizen of the United States solely by virtue of his choice under the treaty.

It may appear invidious, at this late day, to claim that, notwithstanding Articles 8 and 9 of the Treaty of Guadalupe Hidalgo, the distinguished respondent, who has filled high offices before and since the admission of California into the Union is not a citizen of the United States, simply because Congress has not yet seen fit to declare that, in its judgment, the "proper time" had come to provide for his admission. Nevertheless the conclusion, however rigorous, seems inevitable, and the point is by no means a new one.

It was first distinctly raised September 12th, 1849, by Mr. Gilbert, in the Convention that met to frame a Constitution for California. In the long debate which followed (Report p. 62-75) there appears no difference of opinion, except as to whether the Indian citizens of Mexico should have the suffrage. Mr. Gilbert's proposition, even at that early day, required no argument in its support.

The question again came up in committee of the whole as to the qualifications of Senators and Members of the Assembly; and was again mooted in regard to the qualification for the office of Governor, although the section, as reported and afterward adopted, ensured the eligibility of native Californians to that office, at the first election, allowing sufficient time, it was thought, for Congress to adopt the provision contemplated by the ninth Article of the Treaty. (Report, p. 157, *et seq.*)

When the report of the committee of the whole came to be considered by the Convention, the respondent in this proceeding introduced a substitute for the first section of the article on suffrage, the main object of which was to secure the right of voting for the decendants of Indians

(Report, p. 323). Afterward (p. 341) he assented, by way of compromise, to Mr. Vermeule's proviso as it now reads at the end of said section. But throughout this debate it is manifest that he was fully conscious that he, together with his countrymen similarly situated, was, at that time, and would remain, until Congress took special action, merely one of those Mexican citizens in California who had "elected to become citizens of the United States."

The fifth section of the schedule appended to the Constitution again recognizes the distinction, for it invites, to vote on the adoption of that document: "every citizen of California, declared a legal voter by this Constitution, and every citizen of the United States," etc.

Now, if there be anything in the notion that the native Californians became citizens of the United States by simply abstaining to signify, in some way, their desire to "retain the title of Mexicans," (Treaty, art. 8,) then the respondent was one before he became a member of that Convention, viz: as early at least as the 30th of May, 1849.

It can scarcely be contended that the respondent's case was bettered by the admission of California into the Union. For the act of admission merely sanctioned a Constitution which recognizes a distinction between those who by right were already citizens of the United States and those who expected to become so at the proper time, to be "judged of by the Congress of the United States."

Judge Bennett clearly was of the opinion that the admission of the State into the Union, did not make those Mexicans citizens of the United States, when, in *The People* v. *Naglee,* (1 Cal. 232), he classified them as established Mexicans who, not having declared their intention still to continue Mexican citizens, have elected to become American citizens. Far from intimating that they have become such, according to the statement in the syllabus to that case, he takes occasion to criticize the language of the first section of the Foreign Miners' Act, which, aside from the Court's interpretation, would only seem to exempt those Mexicans who had become citizens of the United States under the Treaty,

*i. e.* by virtue of some special declaration of Congress. (*Tobin* v. *Walkinshaw*, 1st. McA. 193.)

An intimation in the case of *The American and Ocean Insurance Company et al.* v. *Canter*, may seem to militate against our view (Peters 542). Evidently the reasoning is based upon the assumption that the treaty in question operated *eo instante* " to admit and incorporate" not to provide for future admission and incorporation; therefore the passage in question, even if not altogether *obiter dictum*, can only be invoked as authority here if a similar construction can be forced upon the ninth article of the Treaty of Guadalupe Hidalgo. At all events the Court nowhere intimates that the inhabitants have become citizens of the United States. To have done so would have been to accord the power of naturalization to the treaty-making power. And with all due respect, it is submitted that the "political power" of which the Court speaks might depend on many things besides the circumstance referred to.

To show that a different rule applies when a treaty contains a provision for future action, we apply to the same high authority. In the case of *Foster & Elam* v. *Neilson* (2 Peters, 314), Judge Marshall says: "A treaty is in its nature a contract between two nations, not a legislative act. It does not generally effect, of itself, the object to be accomplished; especially so far as its operation is infra-territorial; but it is carried into execution by the sovereign power of the respective parties to the instrument. In the United States a different principle is established, our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in Courts of justice as equivalent to an Act of the Legislature, wherever it operates of itself without the aid of legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the Legislature must execute the contract before it can become a rule for the Court." This identical language is incorporated

approvingly in *The United States* v. *Arredondo*, (6 Peters, 735); at p. 710 of the same opinion, the principle is is distinctly asserted and maintained. And, in the case of *The United States* v. *Percheman*, after the Spanish version of the treaty had been laid before and interpreted to the Court (7 Peters 69), the Court reasserts the principle laid down in *Foster & Elam* v. *Neilson*, (Id. p. 89). The language of the Court is: " If the claim was confirmed by the treaty, which is the supreme law of the land, the United States have no power" &c. (p. 79.)  In other words, Percheman's claim stands confirmed because it has been brought to the knowledge of the Court, that the real terms of the treaty, instead of providing, as was thought before, for some législative action in its aid, actually operated to confirm such claim.  In the case of *Garcia* v. *Lee*, (12 Pet. 515) Judge Taney recognizes *Elam* v. *Neilson*, as authority throughout.

We respectfully refer the Court to the following authorities cited by Abbott, and not within our reach. (S. Dist. of N. Y. 1847, matter of Metzger, 5 N. Y. Obs. 83, Ct. of Claims 1855-6; *Humphrey* v. *United States*, Dev. 51, 7th, Circ. Mich. 1852; *Turner* v. *American Baptist Missionary Union*, 5 McLean, 344.)

The distinction in question is, we think, a sufficient answer (although there are others) to any argument based on the authority of *City of New Orleans* v. *Armas and Cucullu*, (9th Pet. 224) and indeed on any of the Louisiana and Florida cases.

The reasoning in the famous case of *Groves et al.* v. *Slaughter* (15 Pet. 449) is amenable, we concede, to the criticism which sooner or later attends all mere political or expediency decisions, but only because it goes infinitely farther than the point we are endeavoring to sustain.

The Constitution of Mississippi contained the following language:  " The introduction of slaves into this State, as merchandise, or for sale, shall be prohibited from and after the first day of May, 1833." The decision of a majority of the Court was that an Act of the Legislature was required to carry that prohibition into effect.

We may also appeal to the practice of our government heretofore:

The treaty of 1803 with France contained the following Article: "The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of the citizens of the United States, and in the meantime protected," &c.

Notwithstanding this assurance, which seems to us as strong as that in the Florida treaty, Congress thought fit to define the status of the inhabitants by the Act of March 2d, 1805. By the first section of that Act it is declared that they shall be "entitled to and enjoy all the rights, privileges and advantages secured by said Ordinance (13th July 1787), and now enjoyed by the people of the Mississippi Territory." Previously to this, their rights and privileges seem to have been only those enumerated in the fifth section of the Act of March 26, 1804.

Furthermore the Act of February 20, 1811, authorizing the "inhabitants" to form a State government, invites certain "inhabitants," in contradistinction with "citizens of the United States" to vote for members of the Convention.

Wherefore, in view of these antecedents, when Congress, April 8th, 1812, admitted Louisiana into the Union, it might well be considered to have redeemed the pledge in the treaty. It is believed that the admission of Louisiana was delayed for seven years—not from the date of the treaty, but from the Act of 1805, defining the political status of the inhabitants—so that the inhabitants might be on an equal level for eligibity to the House of Representatives, under the second subdivision of Section 2, Article 1 of the Constitution of the United States.

In the case of Florida, "An Act for carrying into execution the treaty between the United States and Spain," &c. was passed March 3d, 1821. By its terms the power to establish a government is delegated to the President. But

soon thereafter (March 30, 1822,) Congress, resuming the matter into their own hands, established a government. Section 10 of that Act (3 U. S. L. 658) specifies the rights and immunities of the " inhabitants." Sections 12 and 13 of the amendatory Act of March 3d, 1823 (Id. p. 753) pursue the same object. Further electoral privileges are conceded to the citizens of the territory of Arkansas by the Act of Jan. 21, 1829 (4 U. S. L. 332) while the same act (Sec. 5) amplifies the franchise to the qualified voters of Florida.

The case of Texas offered no difficulties. Here we were dealing with an independent Republic. Section 10 defined citizenship: " All persons (Africans, the descendants of Africans and Indians, excepted) who were residing in Texas on the day of the declaration of independence, shall be considered citizens of the republic, and entitled to all the privileges of such."

Clearly then the joint resolution of Dec. 29, 18s5, (9 Stat. at large, 108) admitting Texas " into the Union on an equal footing with the original States in all respects whatever" admitted those as citizens whom that sovereignty had designated as such, and those only. This would seem to be established in the case of *Benner et al.* v. *Porter,* (9 How. 235) cited in *Calkin & Co.* v. *Cocke,* (14 How. 238) In other words, the Texans became citizens of the United States not because of the admission alone, but because of the fundamental law of the annexed sovereignty at the time of the admission. Now the fundamental law of California discriminates.

We would seem to be justified, without any further demonstration, to assume that the words " at the proper time to be judged of by Congress," so different from the language in the treaties with Spain and France, were inserted in the treaty of Guadalupe Hidalgo with a distinct and definite purpose. But we intend to make that point still clearer.

The original Article IX, as proposed by the Mexican Commissioners, read as follows: " The Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican Republic, conformably with what is

stipulated in the preceding article shall be incorporated into the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights of citizens of the United States. In the meantime they shall be maintained and protected in the enjoyment of their liberty, their property, and civil rights now vested in them according to the Mexican laws. With respect to political rights their condition shall be on an equality with that of the inhabitants of the other territories of the United States, and at least equally good as that of the inhabitants of Louisiana and the Floridas, when these provinces by transfer from the French Republic and the crown of Spain, became territories of the United States.

"The same most ample guaranty shall be enjoyed by all ecclesiastics, and religious corporations or communities, as well in the discharge of the offices of their ministry as in the enjoyment of their property of every kind, whether individual or corporate. This guaranty shall embrace all temples, houses, and edifices dedicated to the Roman Catholic worship, as well as all property destined to its support, or to that of schools, hospitals, and other foundations for charitable or beneficent purposes. No property of this nature shall be considered as having become the property of the American Government, or as subject to be by it disposed of or diverted to other uses.

"Finally the relations and communication between the Catholics living in the territories aforesaid and their respective ecclesiastical authorities, shall be open, free and exempt from all hindrance whatever, even although such authorities should reside within the limits of the Mexican Republic as defined by this treaty, and this freedom shall continue so long as a new demarcation of ecclesiastical districts shall not have been made conformably with the laws of the Roman Catholic Church." (*Tratado de Paz Queretaro*, 1848, pp. 11, 12, 13.)

The American Commissioners, however, insisted upon and obtained the present version. And they had powerful

motives: the Mexicans in the ceded territory were supposed
to be disaffected, particularly in California. The official
correspondence (see for instance Sen. Doc. 1st. Sess. 31st.
Cong. vol. 9) is full of information on this subject.

Bitterness had been added here to that which always
attends war by peculiar circumstances. The first struggle
(the Bear war) was understood to be revolutionary and
unauthorized by any recognized Government. During its
progress it was characterized by bloodly deeds and harsh
retaliation. Soon after the raising of the American flag,
the two highest Mexican officers deserted the country. The
Southern part of the State arose in arms and expelled the
American garrison. Several encounters took place, not
always to the advantage of the invaders. Well might
Congress be left to judge of the proper time when these
Mexicans should be admitted to the enjoyment of the rights
of citizens of the United States.

Besides, a glance at the debates in Congress shows a
prejudice, in the minds of the Senators and Representa-
tives, against the character of the population of the ter-
ritory. Calhoun, in a great white-man-government speech,
is quite emphatic. (Cong. Globe, vol. 19. p. 49). So is
Dayton (Id. p. 499.) To such men the words in question
were tendered as a salve.

If it be pretended, under the authority of *Knowles'* case
(5 Cal. 300) that there is no such thing as a "citizen of the
United States," and that, consequently, the qualification pre-
scribed for District Judges by the Act of 1863 is illusory,
we shall answer that the proviso of the treaty is open to
the same criticism, and shall furthermore cite that case as
authority for the position that there is but one way of turn-
ing a foreigner into a citizen, viz.: the judgment of some
Court of Record, entered in some proceeding authorized by
the general laws of Congress establishing "uniform rules"
on naturalization. That the treaty-making power is, and
always has been, incompetent to naturalize; and that the State
itself, a uniform rule once established by Congress, has no
power to adopt a citizen, except in the manner pointed out

by that rule. And to maintain the last mentioned position it is scarcely necessary to appeal to the authority of the case whose report fills some two hundred pages of the 19th How., from page 393 to the end.

We have hitherto argued with special reference to those "words of solemn import" in the ninth article of the treaty of Guadalupe Hidalgo, which provides for special action by Congress.

We now beg leave to present the view that, even if those words were absent from the treaty, the respondent would not be a citizen of the United States.

The States that formed the original Union, though liberal beyond precedent in the adoption of foreigners, as witnessed by that clause in the Declaration of Independence, where the disinclination of the parent country to encourage foreign immigration is mentioned as a grievance justifying rebellion, realized, to the utmost, the value of the privileges which they extended to aliens. The whole subject of naturalization was referred to Congress. That this grant of power was exclusive appears from many decisions. (*Chirac* v. *Chirac,* 2 Wheat. 269; *U. S.* v. *Villato,* 2 Dall. 372; *Thurow* v. *Massachusetts,* 5 How. 585; *Smith* v. *Turner,* 7 Id. 556; *Dred. Scott* v. *Sanford,* 19 How. 398.) Congress, in the exercise of its constitutional power, announced its settled policy in the Act of April 14th, 1802. The first section of that Act reads as follows: "That any alien, being a free white person, may be admitted to become a citizen of the United States, or any of them, on the following condition *and not otherwise.*"

In 1804 it was thought best to establish another "uniform rule of naturalization" for a certain class of individuals. And the first section of that Act might well serve as a model for an Act to admit to citizenship our Mexican residents whenever Congress shall consider that their probation has been sufficient.

If we have not wholly misunderstood the history of the country, Congress has never, in any single instance, departed from the general rule. It has conferred the privi-

leges of citizenship on the inhabitants of annexed territories, but it has done so by special enactments. It has first defined the political status of the inhabitants, and afterward raised them to a level with other inhabitants of the Union by investing the annexed territory with the dignity of a sovereign State. Or, it has reached the same result by simply approving a State Constitution which declared who were the citizens of that State; and these became immediately entitled to the benefit of the provisions of Section 2, Article IV. of the Federal Constitution.

But when Congress admitted California into the Union, it was neither an independent republic which it incorporated, as in the case of Texas, nor a district prepared for admission by the usual initiatory stage of territorial existence, as in the cases of Louisiana and Florida. It was a portion of Mexico, acquired by purchase, which demanded admission. It tendered a Constitution which far from conferring, or attempting to confer, citizenship upon the Mexican residents, pointedly discriminated between them and the citizens of the United States, though generously conferring the right of suffrage upon the former.

In admitting California, Congress did no more then, as regards its Mexican inhabitants, than to confirm the political status attributed to them in the fundamental law of the admitted State, viz: that of Mexicans residing in California who had elected to become citizens of the United States.

It was not an independent sovereignty which the treaty promised to incorporate. It was a portion of the "Departmento de Californias." If, by any perversion of terms, it should be claimed that the respondent had some status under the Mexican Constitution, at the date of the treaty, as a citizen of California, which the United States might be bound to consider and respect, as was done in the case of Texas, we confidently answer that, under the Mexican Constitution in force at that time there was no such thing as a citizen of any portion of the Republic of Mexico. There was a Republic of Mexico; it was divided geographically and politically into a number of "Departamentos." But

each of these derived its powers solely from the central source of authority. Its legislative body had no life but what was conferred by the nation at large. State-rights, such as we understand them, were unknown in Mexico. The very machinery of local government was prescribed by central legislation (see Constitution of 1836, and law of 20th of March, 1837). There was, therefore, no such thing as a citizen of California, (as we understand the term) before the American conquest. There were simply certain citizens of the Republic of Mexico residing here. This is all that the treaty recognizes, all that the State Constitution acknowledge. Aliens to all intents and purposes, they had never owed any special allegiance to that portion of the Mexican Republic which the treaty annexed; their allegiance was due to the whole Republic of Mexico. By electing to become citizens of the United States, they had no State allegiance to abjure, in terms or by implication, only allegiance to the Republic of Mexico. No special autonomy ever belonged to California as a portion of the Mexican territory, beyond what has been indicated in this hasty sketch. No political rights ever attached to an inhabitant of California, under Mexican rule, except the rights of a Mexican residing there. Wherefore the respondent, at the date of the Treaty had no special franchise, as a Mexican, attached to the circumstance of his dwelling in California. He was simply a Mexican who might or not elect to become a citizen of the United States. He did so elect; but that alone does not make him a citizen.

In conclusion, we insist that the respondent was an alien enemy up to the ratification of the treaty of Guadalupe Hidalgo; that between that time and the date of the admission of the State of California into the Union, he joined, by virtue of his silence, that class of Mexicans who are deemed to have elected to become citizens of the United States, but he is not and never was a citizen within the meaning of the Act of April 20, 1863, prescribing qualifications for the high office which he pretends to fill

*Peachy & Hubert,* for Respondent.

*First*—On the point of conquest, it will suffice to say, in the language of the Supreme Court of the United States, in the case of Percheman (7 Pet. 87), that "the conqueror displaces the former sovereign, and assumes dominion over the country ; the people change their allegiance, and their relation to the ancient sovereign is dissolved." Now it is a well-established principle of the common law, that "if the king of England make a new conquest, the persons there born are his subjects." (Bac. Ab., Tit. Aliens.) Why? Because they are born within the dominions and allegiance of the king. "One born in Ireland, Scotland, or Wales, or any of the king's plantations, is a natural subject of England, because he is born within the allegiance of the king." (Bac. Ab., Tit. Aliens.) All English subjects are either natural born, or denizens (so made by letters patent), or naturalized, by act of parliament. From these three classes alike allegiance is due to the natural person of the king. It was on this distinction between the natural and politic persons of the king, that the celebrated decision in Calvin's case was grounded. It was there held that persons born in Scotland after the English crown came to James I., were born under allegiance to the natural person of the king of England, and might inherit in England. In the case of *Craw* v. *Ramsey* (Vaughan R. 279), it is held that "according to the resolution and reasons of Calvin's case, the specific and adequate cause, why the king's subjects of his other dominion than England, do inherit in England, is, because they are born his natural subjects, as the English are, he being actually king of England at the time of their birth, when their subjection begins ; and so are born liege men to the same king." In the same case, p. 283, we are told that "No fiction of law can make a man a natural subject that is not ; for a natural subject and a natural prince are relatives, and if an act of naturalization should thereby make a man a natural subject, the same subject would have two natural sovereigns, one when

he was born, the other when naturalized, which he can never have more than twó natural fathers, or two natural mothers, except the sovereigns be subordinate, the inferior holding his kingdom as Liege Homager from the Superior."

Under our form of government, there being no such thing as allegiance to any natural person, the ligamen which binds the individual to the State consists entirely in the obligations imposed on him by reason of his being one of many who constitute a State or body politic. If we eliminate everything like a personal relation between natural persons from the idea of citizenship, it is reduced merely to that relationship which exists between the individual and the aggregate of individuals called the State, and out of this relationship arises allegiance.

When, therefore, the United States wrests a province from another, and incorporates it permanently in its own territory, and the country from which it is taken by force, cedes it by treaty, whereby the allegiance due by its inhabitants to the ancient sovereign, is transferred in all its fullness and perfection to the new one, it seems that the inhabitants of that province must be considered citizens of the country to which they have been transferred. Even by the strict principles of the common law, if California had been conquered by England, all persons there born after the conquest, would be English subjects ; because born within the allegiance of the king. But between the allegiance due by those born before, and those born after the conquest, there is no other difference than that the first allegiance comes by transfer, and the second by birth. They have different origins, and different effects ; but they are wholly alike so far as regards obligation to the State, and the absence of obligation to all other States. And therein, if we are not mistaken, is to be found the true test of citizenship in these United States. When the United States conquers a territory by force, and confirms the conquest by treaty ; enforces a temporary allegiance by war, and accepts full and permanent allegiance by contract, transfer and relinquishment on the part of the former

sovereign, it seems to us that the inhabitants of the conquered province bear to the new sovereign all those relations out of which citizenship necessarily arises. These relations, be it further observed, are forced upon the inhabitants by the conqueror, who procures for himself a formal recognization and relinquishment of them by the old sovereign.

We are speaking of citizenship in its simplest form, and entirely divested of those political rights which, under our democratic form of government, are so commonly engrafted upon it as to have given rise to an error common in popular thought, that they are its essentials.

*Second*—If the respondent did not become a citizen by the conquest, cession, and permanent incorporation by the United States of the territory whereon he was then, and has been ever since domiciled, he certainly did become one, by force of the treaty of Guadalupe Hidalgo.

The 8th Article of the treaty is as follows :

"Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican Republic, retaining the property which they possess in said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax or charge whatever.

"Those who shall prefer to remain in the said territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of the exchange of ratifications of this treaty ; and those who shall remain within the said territories after the expiration of that year, without having declared their intention to retain the character of Mexicans, shall be considered to have elected to become citizens of the United States."

The remaining clause of the 8th Article has no bearing on the question involved in this case.

This article of the treaty gives to the Mexicans then domiciled in California, the right to retain their domicile in the ceded territory, and to retain their allegiance to the Republic of Mexico. In this respect, it gives them an advantage which is denied them by the law of nations. For according to that law they may, if they choose, depart within a reasonable time from the conquered territory, taking with them their property or its proceeds; but they cannot remain there domiciled without incuring all the obligations to the new sovereign, which are imposed by full allegiance.

It gives them, moreover, the right to choose between the old and the new sovereigns, to retain the rights of Mexican citizens, or to acquire those of citizens of the United States. It prescribes to them, further, the method by which they may retain their Mexican citizenship or acquire citizenship in the United States.

We regret that the learned counsel of the appellant, failing to notice this article of the treaty, which is so pertinent to the question under discussion that it affords the true grounds of its solution, bestowed all their labor on the ninth article, which has no bearing on it.

We contend that Don Pablo de la Guerra, being a Mexican, then established in California, having refrained from declaring his intention to retain the character of a Mexican citizen, during the time specified in the treaty, elected to become, and by his election did become, a citizen of the United States.

" Our Constitution declares a treaty to be the law of the land. It is consequently to be regarded in Courts of justice, as equivalent to an Act of the legislature, whenever it operates of itself without the aid of legislative provision." (Per Chief Justice Marshall, in *Foster & Elam* v. *Neilson*, 2 Pet. 314.)

Does the eighth article of the treaty, operate of itself, or does it require legislative aid to put it in operation? There can be no doubt that it operates of itself. It is a contract and stipulation with the Republic of Mexico, grant-

ing a privilege to her citizens, and not a mere promise of a future grant. It is a grant direct and immediate to certain Mexicans of the right to retain their Mexican citizenship, or to acquire citizenship in the United States. It is a grant of the right of election, to be exercised in a certain manner, and within a specified time. And this time begins to run from the date of the grant, *i. e.* from the exchange of ratifications, and is limited to one year. If this article had been intended as a mere promise on our part, that Congress shall, at some future time, enact a law conferring on Mexicans established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the treaty, the right to retain their Mexican citizenship, or to become citizens of the United States at their election, it would seem that in fixing a time within which the right of election must be exercised, the date of the law which confers the right, would have been selected as the initial point, and not the date of the exchange of ratifications.

But this is certain, if the treaty operates of itself as a grant to Mexicans then established in the ceded territory, of the right to retain their domicile in California, and their allegiance to Mexico, by making a declaration to that effect, it equally operates of itself as a grant to those same Mexicans of the right to acquire citizenship in the United States, by refraining for the space of one year from an after the exchange of ratifications, to make the declarati aforesaid. For the choice is between remaining a citize Mexico, and becoming a citizen of the United States. right of election which is granted, is the right to choc tween those two things. If they have the right to cho one, they have an equal right to choose the other. spondent chose to become, and, by his election, di a citizen of the United States.

The respondent's counsel say that Judge Ber case of the *People* v. *Nagle*, is far from inti Mexicans who, not having declared their int continue Mexican citizens, have elected to h

can citizens, "have become such." We think this intimation scarcely does justice to the able jurist who delivered the opinion in that case. For he says: "those who have declared such intention (to retain their Mexican citizenship) if there be any, still remain aliens and foreigners, and as such are subject to the same restriction by State authority as the subjects or citizens of any other foreign country." (1 Cal. 351.)

It is clear, therefore, that in Judge Bennett's opinion, the treaty operated of itself to give to Mexicans the right to retain their Mexican citizenship by declaring their intention. The treaty says: "Those who shall prefer to remain in the said territories, may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States." How retain? and how acquire? By "making their election within one year from the date of the exchange of ratifications." If the treaty *proprio vigore* confers the right to retain, it must equally confer the right to acquire. According as the right of election is exercised, Mexican citizenship is retained, or our United States citizenship is acquired; both come of election, or neither.

The ninth article of the treaty does really contain a promise. The United States therein pledge their faith to Mexico that all those Mexicans who, in the exercise of the right of election conferred on them by the eighth article, have not retained their Mexican citizenship, "shall be incorporated in the Union of the United States, and be admitted at the per time, (to be judged of by the Congress of the United s), to the enjoyment of all the rights of citizens of nited States according to the principles of the con- n," &c. This article in our conception, is nothing r less than a promise, that, at some future day, Con- admit California into the Union, and those Mexi- have not retained their Mexicanship, shall be re- members of the new State, entitled to all the izens of the United States according to the he Constitution.

citizen of the United States, as by the eighth

article of treaty Mexicans were permitted to become at their election, is one thing. "To be incorporated into the Union of the United States, and admitted to the enjoyment of all the rights of citizens of the United States according to the principles of the Constitution," is a very different and a very much more august thing, according to the opinion in those days prevailing as to the power and dignity of a sovereign State in the then Union.

The citizenship of the respondent, so far as it could emanate from the treaty, is traced to the ninth article as its only possible source, in the opinion of appellant's counsel. Why the eighth article, which is the true source of his citizenship so far as it comes from treaty stipulation, should have been overlooed by them and disregarded, it is difficult to understand. The appellant's whole argument upon the point that the treaty is not operative of itself, but requires legislative action to give it effect, rests upon a mistaken supposition. It is not the ninth but the eighth article of the treaty that the respondent regards as the source of his right and authority to become a citizen of the United States, in the exercise of the right of election thereby conferred on him. And the respondent might well add, that if the said eighth article has not the meaning which he and all his countrymen imagined they saw plainly expressed on its face, it is the most ingeniously devised article for the suggestion of a serious mistake, that was ever introduced into a solemn treaty.

*Third*—Now we come to the fulfillment of the prom[ise] made in the ninth article of the treaty. The respond[ent,] one of those Mexicans who did not retain his Mexican[ citi]zenship, has been "incorporated into the Union [of the] United States, and admitted at the proper time ([when] Congress appears to have thought it the proper tim[e] enjoyment of all the rights of citizens of the Unite[d States] according to the principles of the Constitution."

The Constitution of the United States gives t[o Congress,] in so many words, the right to admit new St[ates into the] Union: "A State is a body politic, or society [joined] together for mutual safety and advantage."

Nat. Law, 63.) This definition is not the best, because it is equally the definition of things which are not States; but it is true. States are societies of men united together for mutual advantage and safety. To admit a new State into the Union, is to admit a society of men united together for the purpose of government, into-a union composed of similar societies.

Governor Riley's proclamation inviting the people of California to form a State Constitution, under which they might ask for admission into the Union, confers the right to vote for delegates to the Constitutional Convention, upon "every free male citizen of the United States and of Upper California, twenty-one years of age, and actually resident in the district where the vote is offered," &c. (1 Hittel, 80.)

The Constitution formed by the Convention so elected, declares that every white male citizen of the United States, and every white male citizen of Mexico, who shall have elected to become a citizen of the United States, under the treaty of peace exchanged and ratified at Queretaro on the 30th day of May, 1848, of the age of twenty-one years, &c., "shall be entitled to vote at all elections which are now, or may hereafter be-authorized by law," &c. (Const. Cal. Art. 2, Sec. 1.)

And further, "every citizen of California, declared a legal voter by this Constitution, and every citizen of the United States, a resident of this State on the day of election, shall entitled to vote at the first general election under this titution, and on the question of the adoption thereof. . Cal., Schedule, Sec. 5.)

ereas, the People of California have presented a Constitution and asked admission into the Union, which Constitutions submitted to Congress by the President of the United States," &c. Be it enacted by the Senate and House Representatives of the United States of America, in Congress assembled, that the State of California shall be one, and is hereby declared to be one of the United States of America, admitted into the Union on an equal footing with the original States, in all respects whatever."

Who were the "People of California who presented a Constitution and asked admission into the Union?" They certainly included all persons who had the right to vote for delegates to the Constitutional Convention, and upon the question of the adoption of the Constitution. The makers of the organic law of the State must be considered members of the body politic which it creates. It was they "who presented the Constitution and asked admission into the Union;' and it was they who were admitted into the Union under the name of the State of California. And they were admitted on an equal footing, in all respects whatever, with the several peoples, who, under the names of the several States which they respectively composed, made and originated the Union. To say that any one individual of the aggregate, called the People of California, thus admitted into the Union, is not thereby made a citizen of the United States, if he was not one before, is to assert what appears to us simply impossible.

How did there ever come to be a citizen of the United States, if it was not by virtue of the voluntary coming together under the Constitution of the United States, of the independent and sovereign communities, who severally acquired their independence and sovereignty when they renounced allegiance to the British Crown. So entirely independent of each other were these communities, that the Constitution of the United States makes no claim to the adhesion of any one of them; but, in so many words disclaiming such a right, submits itself to the consideration of each separate people or State, as a desirable union for the purposes of mutual welfare and common defense. "The ratification of the Conventions of nine States shall be sufficient for the establishment of this Constitution between the States so ratifying the same." (Const. U. S., Art. VII.)

In the interval between the declaration of independence, and the adoption of the Constitution of the United States, each colony, assuming the sovereignty and the name of a State, regulated, by its own legislation and for itself exclusively, the whole matter of citizenship and allegiance. There

were citizens of Virginia, New York, Georgia, &c.; but there was no citizen of any government common to the colonies. These facts are matters of history. (See, on this point, *Ingles* v. *Trustees of the Sailors' Snug Harbor*, 3 Pet. R. 99.)

How then did there come to be a citizen of the United States? As soon as the Conventions of nine States ratified the Constitution, it became an established government for the States that ratified it. The citizens of those nine States were the first citizens of the United States. But the people of California, that is to say, those persons who, in the language of the Act of Admission, "presented a Constitution, and asked for admission into the Union," were admitted therein under the name and style of the State of California, on an equal footing with the original States, in all respects whatever. Why the name "People of California," as used in the Act of Admission, should be construed to mean the citizens of the United States residing in California, passes our comprehension. The counsel for the respondent can find no reason for the limitation in the want of congressional power, for Congress has a right to admit a new State into the Union, every one of whose citizens, before admission, was an alien to the United States. And so far from finding any circumstance in the relations between California and the Federal Government, to warrant such mutilation of the name, those relations would fully justify the enlargement of a doubtful term, so to embrace the whole class of Mexicans domiciled in California, to whom incorporation "into the Union of the United States," and admission "to the enjoyment of all the rights of citizens of the United States," had been promised by treaty. Certain it is, that if the name People of California, in the Act of Admission, does not embrace "the Mexicans who, in the territories aforesaid, shall not preserve the character of citizens of the Mexican Republic," our government has utterly failed to fulfill its promise of *incorporating* such Mexicans into the Union of the United States; nor is it easy to see how, under the circumstances, that promise can now be fulfilled. For the promise to incorporate those Mexicans domiciled in California, who

shall renounce allegiance to Mexico, into the Union of the United States, means nothing more nor less than to admit them as a body politic or State into the Union.　To naturalize individuals is quite a different thing from incorporating a large body of men, domiciled in a certain territory, into the Union of these United States." But Congress has incorporated one body of men inhabiting California into the Union of these United States. If this body of men does not include those Mexicans in California, whose incorporation "into the Union of the United States," and whose admission to "the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution," was so emphatically promised by the treaty, how is the treaty stipulation to be carried out? We are inclined to believe that Congress has not violated the promises of the treaty by rendering their fulfillment impossible. On the contrary, if we are not to attribute to Congress wanton bad faith, and the most plentiful lack of statesmanship, we must believe that the Constitution which was presented by the people of California to the Congress of the United States, when they asked admission into the Union, was carefully examined by that body of legislators, with special reference to the question: whether by said Constitution, the Mexicans domiciled in California, to whom incorporation into the Union of the United States had been promised, were clearly, and beyond the possibility of doubt, made members of the body politic —named the State of California—then asking admission. Ordinary good faith could not fail to prompt such an inquiry; nor would any legislator, who had the least regard for decency, have failed to denounce the Constitution and to refuse admission to the State, if the Mexicans to whom incorporation into the Union had been promised, had been denied membership in the body politic.

The only question, then, that the logic of this case admits of is: Was the respondent a member of the body politic which was admitted into the Union under the name of the State of California? Was he one of the people of California, within the meaning of that term in the pre-

amble of the Act, who presented a Constitution and asked admission into the Union, and were admitted? How is that fact to be determined? Solely by the Constitution of California; and if, by that organic law, the respondent was not made a member of the body politic, or State of California, or in one word, a citizen of the State of California, then there was no such thing as a citizen of the State. For the Constitution does not declare by formal definition, who shall be citizens of the State, but, in conferring the right of suffrage, it describes as citizens of California all persons who are declared legal voters by this "Constitution," to whom, as well as to every citizen of the United States a resident of this State on the day of election, the right to vote at the first general election under the Constitution, and on the question of the adoption thereof, is given. (Schedule, Sec. 5.) The respondent was a member of the Convention which framed the Constitution, as rightfully a member as any other gentleman who was delegated to perform that duty. The Constitution gave him the right to vote upon the question of its adoption, and describes him as " a citizen of California," entitled to vote at all elections which are now or hereafter may be authorized by law." (Const. Cal., Art 11, ? 1. Schedule, ? 5.) Add to this that California had been in the full and undisputed exercise of all the powers of a State for at least eight months before its admission into the Union, during which time, and at the date of admission, the respondent represented the Senatorial Districts of Santa Barbara and San Luis Obispo in the Senate of the State, and we think there can be little doubt that he was one of the people of California who presented the Constitution and asked admission into the Union.

The appellants' counsel say: " The case of Texas offered no difficulties. Here we were dealing with an independent republic." If we understand the counsel's argument, it is this: All persons who, by the organic law of Texas, were citizens of Texas at the time of its admission, became citizens of the United States by virtue of the admission; but the Constitution of California discriminates between the

citizens of the United States and the Mexicans who had elected to become such, and therefore the Mexicans were not members of the body politic, called the State of California, which was admitted into the Union, and did not thereby become citizens of the United States. There would be some force in this argument if the discrimination referred to excluded said Mexicans from membership in the body politic which was created by the Constitution. But unfortunately for the counsel's argument, the discrimination is resorted to by the Constitution solely for the purpose of describing two classes of persons, both of which classes are to be considered citizens of the State. If there be any doubt as to the inclusion of either class in the term "citizens of California," it cannot refer to the Mexicans who had elected to become citizens of the United States; for they are described in the schedule, section 5, as citizens of California, declared legal voters by this Constitution. Thus the real discrimination is between the white male citizens of Mexico, who have elected to become citizens of the United States, upon whom the right of suffrage is conferred by the first section of the second article of the Constitution, and who, by section 5 of the schedule, are described as citizens of California, and citizens of the United States resident in California. The discrimination is against the citizens of the United States, inasmuch as a distinction is made between them and citizens of California.

We refer the Court to the cases of *Cryer* v. *Andrews*, (11 Texas Reports, p. 182); and to Desbois's case, (Martin La. Rep. N. S. 285); and to the case of *The United States* v. *Laverty*, decided in the District Court of the United States, and reported in the same volume of Martin, p. 747. These cases fully establish the respondent's citizenship..

In the case from Texas, the Court says: "For whether the time be computed from the death or from the Act, still nine years had not elapsed before the consummation of annexation between Texas and the United States; and from that time the plaintiff (a citizen of Arkansas) became virtually a citizen of Texas, and entitled to the privileges

and immunities of citizenship." * * "This position seems so clear that comment in support of it is unnecessary. When the Congress of the United States, under the authority to admit new States, receives a foreign nation into the confederacy, the laws of those respective nations, in relation to the naturalization of individual emigrants, have no application to the respective citizens of each. By the very act of union, the citizens of each become citizens of the government, or governments formed by this union. The position which has been sometimes broached, that the citizens of Texas must submit to the laws of naturalization before they can become citizens of the United States, is quite preposterous." (Id. p. 83.) Now what is said of Texas is true of California. For it is obvious that the civil status of the citizens of the admitted State, considered in reference to the Union, depends, not upon the previous condition of the admitted State, but solely upon what it became by reason of its admission. It is its admission as a State into the Union which places it in such a relation to the Union, that its citizens become citizens of the Union, and all the citizens of the latter become its citizens. By entering the Union all the States assume an equal footing, whatever differences before then may have existed between them in respect to independence and sovereignty.

The effect of incorporating a State into the Union upon an equal footing in all respects whatever with the original States, is to render its condition such as it would have been had the new State been a party to the adoption of the Constitution of the United States. In this point of view we are inclined to deny the correctness of the position of the learned Judge, who, in Desbois's case, above cited, says that admission into the Union is the naturalization of a large body of men by a single act. In our view of the matter, those who were citizens of California at the moment of her admission into the Union were not naturalized thereby. They became citizens of the United States by a much higher warrant, precisely as the citizens of Virginia and Massachusetts and Georgia became citizens

of the United States when they adopted the Constitution; and they certainly were not naturalized citizens.

The Constitution of the United States (Art. 1, Sec. 2) declares that no person shall be a representative, who shall not have been seven years a citizen of the United States when elected, &c. And in Art. II. Sec. I, that no person, except a natural born citizen, or a citizen of the United States, at the time of the adoption of the Constitution, shall be eligible to the office of President. As it was the adoption of the Constitution by the Conventions of nine States that established and created the United States, it is obvious there could not then have existed any person who had been seven years a citizen of the United States, or who possessed the Presidential qualifications of being thirty-five years of age, a natural born citizen, and fourteen years a resident of the United States. The United States in these provisions, means the States united. To be twenty-five years of age, and for seven years to have been a citizen of one of the States which ratifies the Constitution, is the qualification of a representative. To be a natural born citizen of one of the States which shall ratify the Constitution, or to be a citizen of one of said States at the time of such ratification, and to have attained the age of thirty-five years, and to have been fourteen years a resident within one of the said States, are the Presidential qualifications, according to the true meaning of the Constitution.

California having been admitted into the Union on a footing of equality with the original States, in all respects whatever, must be considered as having come into the Union, Congress permitting, by ratifying the Constitution of the United States. To be a State of the Union, on an equal footing in all respects whatever with those States which became members of the Union by their own voluntary ratification of the Constitution which created it, is to be entitled to all the rights and privileges which would result from entrance into the Union, in the mode prescribed by the Constitution for its own primordial establishment. We therefore hold that the respondent became a

citizen of the United States in precisely the same way as Thomas Jefferson and all the other signers of the Declaration of Independence, that is to say : by virtue of the ratification of the Constitution of the United States by the conventions of the several States of which respectively they were citizens.   The ratification of their own Constitution by the people of California, is the ratification of that of the United States ; for in the 12th Section of the Schedule it is provided, that "the senators and representatives to the Congress of the United States, elected by the Legislature and people of California, as herein directed, shall be furnished with certified copies of the Constitution, when ratified, which they shall lay before the Congress of the United States, requesting, in the name of the people of California, the admission of the State of California, into the American Union." Here was the ratification of the Constitution of the United States by a convention of the State of California, which, together with the consent of Congress, signified by the Act of Admission, made California a State of the Union—the equal in all respects whatever of the original States.   The original States agreed among themselves upon the manner in which each one might come into the contemplated Union if it pleased, and gave to Congress the power to admit new States upon the same terms.   The coming into the Union of an original State, depended solely on its own will made known in a prescribed mode.   The coming into the Union of a new State, depends not on its own will alone, but also on the will of Congress, and that is the only difference between the two cases.

*Coffroth & Spaulding*, for Appellant, in reply.

Contended that, if, as contended by respondent, the eighth and ninth articles of the treaty of Queretaro make all citizens of Mexico living in California at the time of the treaty, who did not within one year elect to remain citzens of Mexico, citizens of the United States without any Act of Congress, then the Constitution of the State of California is

repugnant to that treaty; for, by that instrument, a discrimination is made between white citizens of Mexico and Negroes and Indians, who were as much citizens of Mexico as white persons.

TEMPLE, J., delivered the opinion of the Court, WALLACE, J., and CROCKETT, J., concurring:

The respondent was born at Santa Barbara, in 1819, and has ever since resided at that place, and is admitted to have been a white male citizen of Mexico at the date of the treaty of Guadalupe Hidalgo. After the ratification of that treaty he elected to become a citizen of the United States in the mode provided in the treaty. He was a member of the Constitutional Convention which framed the Constitution of California, and has almost continuously, since the adoption of that instrument, held office under its provisions. At the judicial election, held in 1869, he was elected Judge of the First Judicial District, and the relator in this proceeding contests his right to the office, on the ground that he is not a citizen of the United States, as by an Act passed April 20, 1863, it is provided that "no person shall be eligible to the office of District Judge, who shall not have been a citizen of the United States and a resident of this State for two years."

Article IX of the treaty of Guadalupe Hidalgo is as follows: "The Mexicans who, in the Territories aforesaid, shall not preserve the character of citizens of the Mexican Republic, conformably with what is stipulated in the preceding Article, shall be incorporated into the Union of the United States and be admitted at the proper time (to be judged of by the Congress of the United States), to the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution; and in the meantime shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."

It is contended on the part of the relator that Mexicans who were resident in California at the date of the treaty, and who elected in the mode provided to become citizens of the

United States, did not acquire the right of citizenship by the terms of the treaty, but an Act of Congress admitting them to such rights is necessary, and that no such Act having been passed, the respondent is not a citizen.

The question raised would be of very grave import to the people of this State, were it not for the fact that its solution is quite obvious. By the eighth article of the treaty it is provided that the Mexicans who were resident in the ceded territory might either remain or remove to the Mexican Republic, and should be protected in their property. It is then stipulated:

"Those who shall prefer to remain in said Territory may either retain the title and rights of Mexican citizens, or acquire those of citizens of the United States. But they shall be under the obligation to make their election within one year from the date of ratification of this treaty; and those who shall remain in the said Territories after the expiration of that year, without having declared their intention to retain their character of Mexicans, shall be considered to have elected to become citizens of the United States."

The natural consequence of the cession of the Territory by Mexico, and its acquisition by the United States, would be that the allegiance of the inhabitants who remained in it would be transferred to the new sovereign. By the stipulation of the treaty, however, three courses were left open to the inhabitants. One was to remove to the Republic of Mexico; in which event they would, of course, continue to be citizens of Mexico; the second was to remain in the ceded Territory and retain the title and rights of Mexican citizens; the third, to become citizens of the United States.

That the treaty was intended to operate directly, and of itself to fix the status of those inhabitants, does not admit of a doubt. That it had that effect, so far as those who elected to remain citizens of Mexico are concerned, is obvious, and there is no reason for a different construction as to those who elected to become citizens of the United States. In fact, this would have been the natural consequence of the treaty (so far as was possible under our form

of Government), and it required this special treaty stipulation to enable the inhabitants to remain in the ceded territory and owe no allegiance to the new Government. But for this provision the Mexicans who remained would not have been considered aliens, but would have been vested with such rights of citizenship as can be conferred upon the inhabitants of a Territory who are not citizens of any of the States of the Union. But, by the terms of the treaty, those who did not elect to remain citizens of Mexico, lost their rights as Mexican citizens, at least as soon as the election was made, and the conclusion is irresistible that they acquired (so far as was possible) the rights of citizens of the United States at the time they lost those of Mexican citizens ; otherwise they remained a people without a country.

This article of the treaty would probably never have received a different construction from that here given, were it not for the following article, which has been strangely misconstrued. It provides that these Mexicans in the ceded Territories, who do not retain the character of Mexican citizens, shall be incorporated into the Union of the United States, and be admitted at the proper time (to be judged of by the Congress of the United States), to the enjoyment-of all the rights of citizens of the United States, according to the principles of the Constitution. The Union with which they are to be incorporated is, of course, the Union of the States composing the United States, and by which Union that Government is created. They can be incorporated into this Union only as a State, and the admission of the people to the full rights as citizens of the United States follows as the consequence of that act ; and this is the only way in which it was possible for Congress to confer upon them all the rights of citizens of the United States. For this purpose it in not necessary to inquire whether, under our form of Government, there can be a citizen of the United States who is not a citizen of one of the States. I have no doubt that those born in the Territories, or in the District of Columbia, are so far citizens as

to entitle them to the protection guaranteed to citizens of
the United States in the Constitution, and to the shield of
nationality abroad ; but it is evident that they have not the
political rights which are vested in citizens of the States.
They are not constituents of any community in which is
vested any sovereign power of government.   Their position
partakes more of the character of subjects than of citizens.
They are subject to the laws of the United States, but have
no voice in its management.   If they are allowed to make
laws, the validity of these laws is derived from the sanc-
tion of a Government in which they are not represented.
Mere citizenship they may have, but the political rights of
citizens they cannot enjoy until they are organized into a
State, and admitted into the Union.

But the United States cannot acquire territory to hold and
rule permanently in full government.   Such acquisitions are
in pursuance of its power to admit new States, and every
Territory thus acquired must be held to have been acquired
for the purpose of being erected into a State.   Indeed that
may be considered as the last act in the acquisition of the
Territory, for it is then for the first time incorporated into
the Union.   Once admitted into the Union it requires no
Act of Congress to define the rights of the inhabitants who
were recognized as members of the community organized
into a State, "because the Constitution itself defines the
relative rights, powers and duties of the State, and the citi-
zens of the State, and the General Government." *(Scott* v.
*Sandford,* 19 How. 446.)

Having admitted into the Union a State, of which these
inhabitants were constituent members, Congress could do
no more.   It has conferred upon them all the rights of citi-
zens, or rather it has recognized these rights in the only
mode provided by the Constitution which was applicable to
them.

The question involved in this case seems to have been
decided in the case of the *American Insurance Company* v.
*Canter,* (1 Peters, 511.)   This case involved the validity of
a territorial law of Florida, establishing a certain Court.

Chief Justice Marshall, in pronouncing the opinion of the Court, says: "On the 2d of February, 1819, Spain ceded Florida to the United States.' The sixth article of the treaty of cession contains the following provision: 'The inhabitants of the Territories which His Catholic Majesty cedes to the United States by this treaty shall be incorporated in the Union of the United States as soon as may be consistent with the principles of the Federal Constitution; and admitted to the enjoyment of the privileges, rights.and immunities of the citizens of the United States.'"

"This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights and immunities of the citizens of the United States.' It is unnecessary to inquire whether this is not their condition independent of stipulation. They do not, however, participate in political power; they do not share in the Government till Florida shall become a State. In the meantime, Florida continues to be a Territory of the United States, governed by virtue of that clause in the Constitution which empowers Congress 'to make all needful rules and regulations respecting the territory or other property belonging to the United States.'"

But it is suggested by counsel for relator, that if this construction be correct, then the Constitution of California is in conflict with the ninth article of the treaty, for that article provides that all Mexican citizens who elect to become citizens of the United States, shall be admitted to all the rights of citizens, while the Constitution discriminates. It declares that white male citizens of Mexico, who have elected to become citizens of the United States, shall be electors, while all, without distinction of color, including Indians, were Mexican citizens, and entitled to'vote by the laws of Mexico.

If this be so, it does not follow that the respondent is not a citizen of the United States, but that the elective franchise is denied to certain persons who had been entitled to its exercise under the laws of Mexico. The possession of all political rights is not essential to citizenship. When Con-

gress admitted California as a State, the constituent members of the State, in their aggregate capacity, became vested with the sovereign powers of government, "according to the principles of the Constitution." They then had the right to prescribe the qualifications of electors, and it is no violation of the treaty that these qualifications were such as to exclude some of the inhabitants from certain political rights. They were excluded in accordance with the principles of the Constitution.

The respondent is clearly a citizen of the United States, and the judgment should be affirmed.

So ordered.

By RHODES, C. J.: I concur in the judgment.

SPRAGUE, J., expressed no opinion.